UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DERICK LOUIS WILLIAMS,

                                    Plaintiff,

            v.

METRO-NORTH RAILROAD, *et al.*,

                                    Defendants.

No. 17-CV-3092 (KMK)
No. 17-CV-9167 (KMK)
No. 18-CV-7793 (KMK)

DERICK LOUIS WILLIAMS,

                                    Plaintiff,

            v.

JOHN FELTZ, *et al.*,

                                    Defendants.

No. 17-CV-7758 (KMK)
No. 18-CV-8350 (KMK)

OPINION & ORDER

Appearances:

Derick Louis Williams
Bronx, NY
*Pro se Plaintiff*

Jennifer Anne Mustes, Esq.
Metro-North Commuter Railroad
New York, NY
*Counsel for Defendants Metro-North Railroad, Kevin Rogers, Trevor Havard, Mick Keitt, Daniel Knauth, and Allen Rossney*

Steven Charles Farkas, Esq.
Colleran, O'hara & Mills LLP
Woodbury, NY
*Counsel for Defendants John Feltz, Patrick Howard, and Transport Workers Union of America, Local 2001*

KENNETH M. KARAS, United States District Judge:

Derick Louis Williams ("Plaintiff"), proceeding pro se, brings these Actions under the Federal Rail Safety Act ("FRSA"), 42 U.S.C. § 20109(d)(3), Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296.  In the first consolidated Action (the "Metro-North Action"), Plaintiff alleges racial discrimination, harassment, and retaliation by Metro-North Railroad ("Metro-North") and certain of its employees, Kevin Rogers ("Rogers"), Mick Keitt ("Keitt"), Trevor Havard ("Havard"), Daniel Knauth ("Knauth"), and Allen Rossney ("Rossney") (collectively, Metro-North Defendants).[1]  In the second consolidated Action (the "Union Action"), Plaintiff alleges that the Transport Workers Union of America, Local 2001 ("the Union"), and two of its officers, John Feltz ("Feltz") and Patrick Howard ("Howard") (collectively, "Union Defendants"), provided Plaintiff with ineffective representation in connection with disciplinary proceedings conducted by Plaintiff's employer.  Before the Court are Metro-North Defendants' and Union Defendants' respective Motions to Dismiss.  For the reasons discussed herein, both Motions are granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's operative complaints and assumed to be true for the purposes of this Motion.  The Court recounts only the facts that are necessary in deciding the instant Motion.

---

[1] Although Plaintiff's pleadings refer to "Trevor Harvard," it appears the correct name of this Defendant is "Trevor Havard."

1.  The Car Cleaning Incident

At the time of the relevant incidents, Plaintiff was a coach cleaner employed by Metro-North.  (Aug. 2017 Compl. I at 6, 41 (Case No. 17-CV-3092, Dkt. No. 8).)[2]  On November 26, 2016, Plaintiff and his co-worker "Nesbeth" were cleaning train bathrooms.  (Aug. 2017 Compl. II at 1 (Case No. 17-CV-3092, Dkt. No. 8-1).)  When Plaintiff approached the train's second bathroom, he saw that Nesbeth had pushed a bloody tampon out of the bathroom into the hallway of the car.  (*Id.*)  Plaintiff instructed Nesbeth to cover the tampon with toilet paper, spray the area, and then pick the tampon up with a latex glove.  (*Id.*)  Nesbeth realized he had violated the protocol for dealing with such items, and, in a scheme to cover up his own oversight, Nesbeth accused Plaintiff of threatening him.  (*Id.*)

Defendant Keitt, a foreman, was present during the cleaning incident, and reported Nesbeth's violation of protocol to Defendant Rogers, a general foreman, by both phone and email.  (Aug 2017 Compl. I at 6, 11.)  Nevertheless, on December 2, 2016, Rogers removed Plaintiff from service and sent him home, explaining that he was doing so because Nesbeth had accused Plaintiff of acting in a threatening manner.  (*Id.* at 13.)  Plaintiff argued that the reality was reversed—that Nesbeth had actually threatened Plaintiff—and he suggested two witnesses that could corroborate his version of the events.  (*Id.*)  Nevertheless, Rogers removed Plaintiff from service for a week.  (*Id.*)

At a Metro-North "pretrial" disciplinary hearing held on December 20, 2016, Plaintiff refused to plead guilty to threatening Nesbeth.  (*Id.* at 14.)  Thereafter, Plaintiff's disciplinary

---

[2] Because Plaintiff has filed five separate actions, the Court refers to filings in each of these dockets by both case number and docket number.  Additionally, the Court refers to the operative complaint in each action by the month of its filing.  Where Plaintiff filed a single complaint in two parts, the Court refers to each filing as "Compl. I" or "Compl II."

"trial" was not held until months later, July 20, 2017, a delay that violated Metro-North policies. (*Id.*)

2.  The Disciplinary Hearing

Plaintiff's disciplinary trial was finally held on July 20, 2017.  (*Id.* at 14).  Plaintiff was represented by the Union and its then-president, Defendant Feltz. (Oct. 2017 Compl. 11 (Case No. 17-CV-7558, Dkt. No. 2).)  At the trial, the Hearing Officer, Defendant Knauth, denied Feltz's request that the charges be dismissed based on the extended delay.  (Aug. 2017 Compl. I at 14.)  Knauth then allowed into evidence a written statement from a witness that had never been presented to Plaintiff for prior questioning.  (*Id.*)  Knauth also rejected Feltz's attempt to introduce a conversation between Feltz and non-party George Giles ("Giles"), an investigator from Metro-North's Security Department who had found that evidence concerning Plaintiff's case was "inconclusive."  (*Id.* at 14–15.)  Moreover, both Giles and Metro-North Labor Relations refused to provide Feltz with Giles' report.  (*Id.* at 15.)

Throughout the hearing, Knauth asked leading questions, interrupted Plaintiff's representatives and witnesses, and referred to certain Metro-North witnesses as his "friends." (*Id.*)  Knauth also appeared to acknowledge to Feltz that he believed some of the Metro-North witnesses may have been lying.  (*Id.*)  Additionally, although Keitt testified that he informed Rogers about the November 26, 2016 cleaning incident, Rogers denied knowing anything about it during his own testimony.  (*Id.*)  Rogers also admitted that, although the preparation of disciplinary charges was his own responsibility, he had delegated the task to Knauth and Defendant Rossney, an Assistant Chief Mechanical Officer.  (*Id.* at 16.)  Ultimately, Plaintiff was assessed a 20-day actual suspension and a 25-day deferred suspension.  (Nov. 2017 Compl. I at 41 (Case No. 17-CV-09167, Dkt. No. 2).)

On July 28, 2017, Feltz sent a letter on behalf of Plaintiff and the Union protesting the process and outcome of the trial. (Oct. 2017 Compl. 30–33.) On August 25, 2017, Feltz communicated to Metro-North that Plaintiff had decided not to appeal the trial outcome. (Nov. 2017 Compl. II at 18 (Case No. 17-CV-9167, Dkt. No. 2-1).) While Plaintiff acknowledges that Feltz is a "[g]ood[]man," Plaintiff now alleges that Feltz and the Union "drop[ped] the ball" in representing him. (Oct. 2017 Compl. 12.) Plaintiff believes that Feltz permitted Metro-North to "bully the Union" and place Plaintiff in "double jeopardy." (*Id.* at 11–13.)

### 3. Plaintiff Returns to Work

On October 17, 2017, Plaintiff's suspension ended, and he was given permission to return to work. (Nov. 2017 Compl. I at 9.) Nevertheless, upon arrival, Plaintiff was questioned and detained by Metro-North security officers and police. (*Id.* at 9, 22.) Plaintiff alleges that the detention was deliberate, noting that "Andrew the train master" chose to call the police instead of inquiring with Rogers to determine whether Plaintiff was permitted on the premises. (*Id.* at 22.) As a result of this incident, Plaintiff was "humiliated, embarrassed[ed], disgrace[d,]" and "put to shame." (*Id.*) Although a security officer documented the incident, Plaintiff has been unable to obtain a copy of their report. (*Id.* at 14–15.) Plaintiff also alleges that Keitt repeatedly attempted "to bait [Plaintiff] into an argument," and that Metro-North police instructed Plaintiff to stay away from Nesbeth. (*Id.* at 16–17.)

### 4. Incident with Lance Givans

In early 2018, non-party Lance Givans ("Givans") was transferred to North White Plains from another Metro-North site where he had a history of starting fights. (Aug. 2018 Compl. 14, 21–22 (Case No. 18-CV-7793, Dkt. No. 2).) On July 24, 2018, Plaintiff approached Givens in the locker-room and asked to speak with him. (*Id.* at 21.) An argument ensued, and Givans

called Plaintiff a "house nigger" and a "55-year old nigger" and accused Plaintiff of hating "Jamaicans and subservient people." (*Id.* at 8, 21–24, 36–37.) According to Plaintiff, Rossney "handled [the incident] right by putting [both Plaintiff and Givans] out of service until the investigation [was] over." (*Id.* at 24.)

Despite Rossney's handling of this incident, Plaintiff believes he has been discriminatorily treated. In particular, Plaintiff alleges that while he has received disciplinary charges of "workplace violence and conduct unbecoming," a white co-worker, Dave Gray, who once threw a walkie-talkie at another Metro-North employee in a train-yard in Brewster, was simply transferred to a different work site. (*Id.* at 13.) Plaintiff acknowledges that Gray was eventually fired for placing trash in another train cleaned by a co-worker. (*Id.*)

### 5. Plaintiff's Administrative Complaints

On January 11, 2017, Plaintiff filed a complaint with the Occupational Safety and Health Administration ("OSHA"). (Aug. 2017 Compl. II at 21.) On August 15, 2017, Plaintiff notified OSHA that he had elected to pursue the case in federal court. (Aug. 18, 2017 OSHA Letter (Case No. 17-CV-3092, Dkt. No. 21 at 13).) On August 18, 2017, OSHA responded, dismissing Plaintiff's complaint and noting that, as more than 210 days had passed since Plaintiff filed his OSHA complaint, he was free to bring the case in federal court. (*Id.*)

On January 17, 2017, Plaintiff filed a complaint against Metro-North in the New York State Division of Human Rights ("NYSDHR"). (Aug. 2017 Compl. II at 9.)[3] Plaintiff described the November 26, 2016 cleaning incident and characterized the discipline as retaliation "for trying to cover up the incident that happen[ed] on the site dealing with O.S.H.A." (Aug. 2017

---

[3] Although NYSDHR recorded this complaint as having been filed on January 17, 2017, it appears, based on a time-stamp, that the complaint was received by the regional NYSDHR office on December 21, 2017. (*See* Aug. 2017 Compl. I at 37.)

Compl. I at 40.)  Plaintiff also named Rogers, Keitt, and Defendant Havard, another Metro-North

foreman, as the specific individuals who discriminated against him.  (*Id*. at 37.)  On June 30,

2017, NYSDHR issued a Determination and Order After Investigation, concluding that there was

no probable cause to believe that Defendants had engaged in a relevant unlawful discriminatory

practice.  (Decl. of Jennifer Mustes in Supp. of Mot. To Dismiss ("Mustes Decl.") Ex. B ("June

30, 2017 NYDHR Decision") (Case No. 17-CV-3092: Dkt. No. 83-2).)[4]

On October 4, 2017, Plaintiff filed a second NYSDHR complaint.  (*See* Nov. 2017

Compl. I at 8).  On April 10, 2018, the NYSDHR issued a second Determination and Order After

Investigation dismissing this complaint, again concluding that there was no probable cause to

believe that Defendants had engaged in a relevant unlawful discriminatory practice.  (*See* Mustes

Decl. Ex. H ("April 10, 2018 NYSDHR Decision") (Case No. 17-CV-3092, Dkt. No. 83-10).)[5]

On August 17, 2018, Plaintiff filed a third NYSDHR complaint.  (Aug. 2018 Compl. 35.)

On February 13, 2019, NYSDHR again dismissed this complaint with a finding of no probable

cause.  (Feb. 13, 2019 NYSDHR Decision (Case No. 18-CV-07793, Dkt. No. 15 at 3).)

B.  Procedural Background

1.  Metro-North Action

On April 26, 2017, Plaintiff initiated the Metro-North Action by filing his initial

complaint against Defendants Metro-North, Rogers, Keitt, and Havard, accompanied by an

---

[4] Plaintiff includes in his pleadings only one page of the NYSHR's Determination and Order After Investigation.  (Aug 2017 Compl. II at 8.)  Nevertheless, the Court can consider the complete document because it is "permissible to consider full text of documents partially quoted in [a] complaint."  *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (citation omitted).

[5] Although Plaintiff filed this complaint on October 4, 2017, the April 10, 2018 NYSDHR Decision incorrectly describes that complaint has having been filed on "10/13/2017." The latter date is, however, the day on which NYSDHR acknowledged receipt of Plaintiff's October 4, 2017 complaint.  (*See* Nov. 2017 Compl. I at 8).

Application to proceed in forma pauperis ("IFP"). (Case No. 17-CV-3092, Dkt. Nos. 1–2.) On

June 16, 2017, Chief Judge McMahon liberally interpreted Plaintiff's pleading as attempting to

raise claims under Title VII and the FRSA, but directed Plaintiff to amend his Title VII claim to

provide factual allegations that could support an inference of discrimination, and stayed

Plaintiff's FRSA claim pending a decision by OSHA on Plaintiff's FRSA complaint. (Case No.

17-CV-3092, Dkt. No. 5.) In response to that Order, Plaintiff filed the operative August 2017

Complaint on August 15, 2017. (Case No. 17-CV-3092, Dkt. No. 8.)

On October 24, 2017, Plaintiff filed an additional document, apparently seeking leave to

add allegations to his August 2017 Complaint. (Case No. 17-CV-3092, Dkt. No. 21.) On

November 8, 2017, the Court issued an Order directing Plaintiff to include any such allegations

in a third amended complaint, to be filed no later than November 30, 2017. (Nov. 9, 2017 Memo

Endorsement Order 4 (Case No. 17-CV-3092, Dkt. No. 26).)

On November 21, 2017, rather than filing a third amended complaint, Plaintiff filed a

second suit against Defendants Metro-North, Rossney, Rogers and Knauth, accompanied by an

IFP Application. (Case No. 17-CV-9167, Dkt. Nos. 1–2.) On December 18, 2017, the Court

granted the Application. (Case No. 17-CV-9167, Dkt. No. 3.) On December 29, 2017, the Court

entered an Order consolidating the two suits, explaining that the complaints in both cases

"describe substantially related underlying events arising out of the same or substantially related

operative facts, and assert the same or substantially related causes of action against some of the

same defendants." (Dec. 29, 2017 Order 2 (Case No. 17-CV-9167, Dkt. No. 5).)

On August 27, 2018, Plaintiff filed a third suit against Defendants Metro-North, Rossney,

and Knauth, accompanied by an IFP Application. (Case No. 18-CV-07793, Dkt. Nos. 1–2.) On

October 17, 2018, IFP status was again granted. (Dkt. No. 3.) On January 9, 2019, the Court

again entered an Order consolidating this third suit with both prior suits into the consolidated Metro-North Action. (Case No. 18-CV-07793, Dkt. No. 9.) The Court explained that the complaints in all three suits "describe substantially related underlying events arising out of the same or substantially related operative facts, and assert the same or substantially related causes of action against some of the same defendants." (*Id.* at 2.)

On July 18, 2019, the Metro-North Defendants filed a Motion To Dismiss and accompanying papers. (Not. of Mot. (Case No. 17-CV-3092, Dkt. No. 82); Mustes Decl.; Metro-North Defs.' Mem of Law in Supp of Mot. To Dismiss ("Metro-North Defs.' Mem.") (Case No. 17-CV-3092, Dkt. No. 84).) On July 31, 2019, Plaintiff filed a document styled "Motion of Discovery to Show Cause," which the Court construes as his Response. (Case No. 17-CV-3092, Dkt. No. 86.) On September 5, 2019, Metro-North Defendants filed a Reply. (Case No. 17-CV-3092, Dkt. No. 87).

### 2. Union Action

On October 10, 2017, Plaintiff initiated the Union Action by filing the October 2017 Complaint against Defendant Feltz, accompanied by an Application to proceed IFP. (Case No. 17-CV-07758; Dkt. Nos. 1–2.) On December 20, 2017, IFP status was granted. (Case No. 17-CV-7758, Dkt. Nos. 3.) On June 19, 2018, Feltz filed a Motion To Dismiss and accompanying papers. (Case No. 17-CV-7758, Dkt. Nos. 16–18.) On June 27, 2018, Plaintiff filed a Response. (Case No. 17-CV-7758, Dkt No. 20.)

On September 12, 2018, Plaintiff filed an additional suit against the Union and its president, Patrick Howard, accompanied by an Application to proceed IFP. (Case No. 18-CV-8350, Dkt. Nos. 1–2.) On October 30, 2018, IFP status was granted. (Case No. 18-CV-8350, Dkt. No. 3.) On November 29, 2018, the Court issued an Order of Service, dismissing claims

against Howard and directing service on the Union. (Case No. 18-CV-8350, Dkt. No. 6.) On January 14, 2019, the Court issued an Order consolidating the two Union suits into the consolidated Union Action, explaining that the "complaints describe substantially related underlying events arising out of the same or substantially related operative facts, and assert the same or substantially related causes of action against some of the same defendants." (Jan. 14, 2019 Order 2 (Case No. 18-CV-8350, Dkt. No. 8).)

On January 17, 2019, the Court issued an Order to Show Cause, directing Plaintiff to explain, within 30 days, why the consolidated Union Action should not be dismissed on the grounds that Plaintiff's "allegation of poverty" was untrue. (Jan. 17, 2019 Order 1 (Case No. 17-CV-7758, Dkt. No. 26).) At the same time, the Court denied Feltz's then-pending Motion To Dismiss without prejudice. (*See id.*) On April 4, 2019, pursuant to its Order to Show Cause, the Court dismissed the consolidated Union Action on the grounds that Plaintiff's claims of poverty appeared to be untrue. (Case No. 17-CV-7758, Dkt. No. 28.) On April 15, 2019, Plaintiff filed an additional IFP Application and attached documents substantiating his claims of poverty. (Case No. 17-CV-7758, Dkt. No. 29.) On May 14, 2019, the Court again granted Plaintiff IFP status and reopened the consolidated Union Action. (Case No. 17-CV-7758, Dkt. No. 30.)

On July 19, 2019, Union Defendants filed the instant Motion To Dismiss and accompanying papers. (Not. of Mot. (Case No. 18-CV-8350, Dkt. No. 18); Decl. of Steven C. Farkas in Supp. of Mot. To Dismiss ("Farkas Decl.") (Case No. 18-CV-8350, Dkt. No. 19); Union Defs.' Mem of Law in Supp of Mot. To Dismiss ("Union Defs.' Mem.") (Case No. 18-CV-8350, Dkt. No. 20); Aff. of John Feltz in Supp. of Mot. To Dismiss ("Feltz Aff.") (Case No. 18-CV-8350, Dkt. No. 21).) On August 29, 2019, Plaintiff filed his Response. (Case No. 18-CV-8350, Dkt. No. 23.) Union Defendants have not filed a Reply.

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous

departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering the instant Motions, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedure and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). However, when the complaint is drafted by a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, "documents that a pro se

litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

B. Analysis

1. Metro-North Claims

While Plaintiff does not precisely delineate his specific claims against Metro-North Defendants, the Court interprets Plaintiff's pleadings liberally and construes them as raising claims under the NYSHRL, Title VII, FRSA, and the Due Process Clause of the Fourteenth Amendment. The Court addresses each claim in turn.

a. NYSHRL Claims

Section 297(9) of the NYSHRL states that "[a]ny person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . unless such person had filed a complaint hereunder or with any local commission on human rights." N.Y. Exec Law § 297(9). Accordingly, once a plaintiff pursues his or her NYSHRL claims in the NYSDHR, Section 297(9) serves as jurisdictional bar, prohibiting consideration of those same claims in a new, plenary action. *See York v. Ass'n of Bar of City of N. Y.*, 286 F.3d 122, 127 (2d Cir. 2002) (explaining that NYSHRL claims, once brought in the NYSDHR, "may not be brought again as a plenary action in another court" and may be appealed "only to the Supreme Court of State of New York" (citations omitted)); *Holmes v. YMCA of Yonkers, Inc.*, No. 19-CV-620, 2020 WL 85389, at *4 (S.D.N.Y. Jan. 7, 2020) (same).

Here, Plaintiff pursued his NYSHRL claims in several complaints to the NYSDHR, each of which was dismissed for lack of probable cause. On January 17, 2017, Plaintiff filed his first complaint with the NYSDHR, (*see* Aug. 2017 Compl. II at 8–9) which was dismissed on June

30, 2017, (*see* June 30, 2017 NYSDHR Decision). On October 4, 2017, Plaintiff filed his second complaint with the NYSDHR, (*see* Nov. 2017 Compl. I at 8), which was dismissed on April 10, 2018, (*see* April 10, 2018 NYSDHR Decision). And on August 17, 2018, Plaintiff filed his third complaint with the NYSDHR, (*see* Aug. 2018 Compl. 35), which was dismissed on February 13, 2019, (Feb. 13, 2019 NYSDHR Decision). Because the NYSDHR "dismissed Plaintiff's case on the merits . . . , this Court does not have the authority to re-hear Plaintiff's NYSHRL claim, and it must be dismissed." *Mejia v. White Plains Self Storage Corp.*, No. 18-CV-12189, 2020 WL 247995, at *4 (S.D.N.Y. Jan. 16, 2020) (collecting cases).

### b. Title VII: Individual Defendants

It is well-settled that individuals cannot be held liable under Title VII. *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) ("Employers, not individuals, are liable under Title VII." (citation omitted)); *see also Johnson v. Allick*, No. 18-CV-7171, 2019 WL 569106, at *4 (E.D.N.Y. Feb. 12, 2019) (noting that "individuals are not subject to liability under Title VII" (citations omitted)). Accordingly, insofar as Plaintiff seeks to pursue Title VII claims against any Defendant other than Metro-North, the claims are dismissed with prejudice. *See Akinde v. N. Y. C. Health & Hosp. Corp.*, No. 16-CV-8882, 2019 WL 4392959, at *8 (S.D.N.Y. Sept. 13, 2019) (dismissing Title VII claims against individuals rather than employers).

### c. Title VII: Metro-North

To plead a prima facie case of discrimination under Title VII a plaintiff must allege that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (citation omitted). Similarly, to state a claim for

retaliation under Title VII, a plaintiff must plausibly allege that: "(1) defendants discriminated—or took an adverse employment action—against him, (2) 'because' he has opposed any unlawful employment practice." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (citation omitted); *see also Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *11 (S.D.N.Y. Aug. 11, 2016) (same).

The first element is not being challenged in the Motions. Regarding the second element, although Plaintiff does not explain precisely which of his allegations constitutes "adverse employment actions," the Court discerns several possibilities from Plaintiff's operative complaints and attached documents. First, on December 2, 2016, Rogers removed Plaintiff from service and sent Plaintiff home based on Nesbeth's allegation that Plaintiff acted in a threatening manner. (Aug. 2017 Compl I at 13.) Second, at his disciplinary "trial" on July 20, 2017, Plaintiff was assessed a 20-day actual suspension and a 25-day deferred suspension. (Nov. 2017 Compl. I at 41.) And third, on October 17, 2017, Plaintiff was questioned and detained by Metro-North security and police officers despite receiving permission to return to work. (*Id.* at 9, 22.)[6]

---

[6] In addition to discrete, adverse employment actions, a Title VII plaintiff may also pursue claims based on an employer's creation of, or requirement that an employee work within, "a discriminatorily hostile or abusive environment." *Littlejohn v. City of N. Y.*, 795 F.3d 297, 320 (2d Cir. 2015) (citation omitted). Such environments are those that are "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In order to be actionable, the hostile work environment must be attributable to the employer through common law agency principles. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–55 (1998) ("Congress has directed federal courts to interpret Title VII based on agency principles. . . . We rely on the general common law of agency, rather than on the law of any particular State, to give meaning to these terms." (citation and quotation marks omitted)). Thus, where a supervisor creates the hostile environment, the employer is usually liable because "the injury could not have been inflicted absent the agency relation." *Id.* at 761–62. However, where an employee's hostile work environment is created by a non-supervisory co-worker, the "employer can still be liable,

i.  Discrimination

Assuming that each of these alleged incidents constitutes an "adverse employment action," none can sustain a claim under Title VII because Plaintiff has failed to plausibly allege that any of these incidents "occurred under circumstances giving rise to an inference of discriminatory intent."  *Brown*, 673 F.3d at 150 (citation omitted).  Generally, a plaintiff will satisfy his "minimal burden" of plausibly alleging discriminatory intent by pleading "factual circumstances—such as preferential treatment given to dissimilarly situated individuals, or remarks that convey discriminatory animus—from which the Court can infer discrimination on the basis of protected status."  *Allen v. N. Y. C. Dep't of Envtl. Prot.*, 51 F. Supp. 3d 504, 514 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Littlejohn v. City of N. Y.*, 795 F.3d 297, 312 (2d Cir. 2015) ("An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically [or sex-based] degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." (citation and quotation marks omitted)); *Rodriguez v. Town of Ramapo*, 412 F. Supp. 3d 412, 435 (S.D.N.Y. 2019) (same).

---

but only for its own negligence."  *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 92 (2d Cir. 2019) (citation and quotation marks omitted); *see also Vance v. Ball State Univ.*, 570 U.S. 421, 445–47 (2013) (explaining the application of agency principles to hostile work environment claims).  Accordingly, insofar as Plaintiff suggests that Givans' racial comments created a hostile work environment, such an environment is not attributable to Metro-North because (1) Givans was Plaintiff's co-worker rather than supervisor, and (2) Plaintiff himself acknowledges that Metro-North took prompt and decisive action in response.  (*See* Aug. 2018 Compl. 8, 21–24.)  *See Summa v. Hofstra Univ.*, 708 F.3d 115, 124–25 (2d Cir. 2013) (dismissing hostile work environment claims because conduct could not be imputed to the plaintiff's employer).

Here, however, Plaintiff has failed to plead any such factual circumstances. While Givans' alleged remarks to Plaintiff may indeed convey racial animus, Givans was Plaintiff's co-worker, not a supervisor. (*See* Aug. 2018 Compl. 21, 37.) Accordingly, there are no grounds to infer that Givans contributed in any way to the adverse employment actions identified above. *See Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 399 (S.D.N.Y. 2013) (explaining that there is no inference of employer discrimination where a non-supervisor, who had no input into an adverse employment decision, made racist comments), *aff'd*, 586 F. App'x 739 (2d Cir. 2014); *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote [from] the date of the decision." (citation and quotation makrs omitted)). Moreover, Givans was not transferred to North White Plains until early 2018, months after the disciplinary and detention incidents stemming from Plaintiff's interaction with Nesbeth. (Aug. 2018 Compl. 21–22.) Accordingly, any discriminatory animus on Givans' part did not contribute, and could not have contributed, to the disciplinary actions taken against Plaintiff—most of which occurred well before his arrival. *See Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149–50 (2d Cir. 2010) (explaining that, whether discriminatory remarks suggest discrimination depends on, inter alia, "when the remark was made in relation to the employment decision at issue" (collecting cases)); *cf. Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (explaining that a plaintiff can "establish a causal connection to support a discrimination or retaliation claim" by showing that discriminatory remarks or plaintiff's legally protected activity "was closely *followed* in time by the adverse employment action" (emphasis added) (citation, alteration, and quotation marks omitted)).

Plaintiff's invocation of a purported white comparator, "Dave Gray," (*see* Aug. 2018 Compl. 13), also fails to raise an inference of discrimination regarding Plaintiff's disciplinary sanctions. "Although the question of whether an employee is similarly situated to the plaintiff is generally a question of fact for the jury to decide, courts in the Second Circuit have held that the plaintiff must at least plead allegations from which it is plausible to conclude that the comparators are similarly situated." *Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *9 (S.D.N.Y. Sept. 30, 2016) (citation and quotation marks omitted); *see also Littlejohn*, 795 F.3d at 312 (reviewing a district court's decision granting a motion to dismiss and noting that "the district court correctly concluded that adverse actions taken against employees who are not similarly situated cannot establish an inference of discrimination" (citation omitted)). Here, Plaintiff and the alleged comparator are not similarly situated. First, Plaintiff acknowledges that Gray worked in "Brewster Yard," (Aug. 2018 Compl. 13), a different Metro-North facility than the North White Plains facility at which Plaintiff worked. The difference in work locations, with different work environments and different supervisors making disciplinary decisions, undermines any claim to being "similarly situated." *See Williams v. N. Y. State Unified Court Sys. Office of Court Admin.*, No. 16-CV-2061, 2017 WL 4402562, at *11 (S.D.N.Y. Sept. 30, 2017) (dismissing a Title VII claim because the plaintiff did not "allege that he was employed in the same department, subject to the same supervisors, or of a similar experience level as his comparators" (citations omitted)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (explaining that a plaintiff and comparators are often not similarly situated where they have different supervisors); *cf. Pothen v. Stony Brook Univ.*, 211 F. Supp. 3d 486, 495–96 (E.D.N.Y. 2016) (allowing disparate treatment claim where plaintiff identified one comparator by name and alleged he was subject to the same supervisor).

Second, Plaintiff's filings indicate that Plaintiff had a long disciplinary history, with multiple infractions dating back at least to 2008. (*See* Aug. 2018 Compl. 61, 74, 85.) By contrast, Plaintiff alleges that Gray had only a single previous disciplinary incident ("conduct unbecoming") prior to the allegedly comparable episode. (*Id.* at 13.) This substantial difference between Plaintiff's and Gray's disciplinary histories further undermines any attempt to use Gray as a "similarly situated" comparator. *See Whittle v. County of Sullivan*, No. 16-CV-725, 2017 WL 5197154, at *7 (S.D.N.Y. Nov. 8, 2017) (rejecting comparator analysis where plaintiff failed to plead, inter alia, how supposed comparators' "disciplinary histories compared to his"); *Toussaint v. NY Dialysis Servs., Inc.*, 230 F. Supp. 3d 198, 217 (S.D.N.Y. 2017) (finding, on summary judgment, that difference between plaintiff's and a comparator's disciplinary histories precluded a finding of discrimination), *aff'd*, 706 F. App'x 44 (2d Cir. 2017); *Rommage v. MTA Long Island R. R.*, No. 08-CV-836, 2010 WL 4038754, at *9–11 (E.D.N.Y. Sept. 30, 2010) (rejecting, on summary judgment, comparators with less substantial disciplinary histories), *aff'd*, 452 F. App'x 70 (2d Cir. 2012). Accordingly, because Plaintiff fails to raise an inference of discriminatory intent, either by alleging relevant discriminatory remarks or a similarly situated comparator, Plaintiff's Title VII discrimination claims are dismissed.[7]

---

[7] Plaintiff's operative complaints also contain numerous conclusory allegations of racial discrimination, including assertions that he is the victim of "institutional racism" and "managerial racism." (*See e.g.*, Aug. 2017 Compl. I at 3; Nov. 2017 Compl. 5.) Such conclusory allegations are inadequate to plausibly plead discriminatory intent. *See Guerrero v. City of N. Y.*, No. 18-CV-5353, 2020 WL 567294, at *4 (E.D.N.Y. Feb. 5, 2020) (explaining that allegations that defendants "engaged in racial and gender stereotyping" were conclusory and insufficient (quotation marks omitted)); *Nguedi v. Fed. Reserve Bank of N. Y.*, No. 16-CV-636, 2017 WL 2557263, at *5 n.3 (S.D.N.Y. June 12, 2017) (explaining that a pro se plaintiff's "conclusory allegations . . . that his termination was 'rooted in racism and racial discrimination,'" were "insufficient to sustain his claim" under Title VII (record citations omitted)).

### ii. Retaliation

Plaintiff's Title VII retaliation claims fail for similar reasons that his underlying discrimination claims fail. Title VII's retaliation provision provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Vega*, 801 F.3d at 89–90 (2d Cir. 2015) (alteration and quotation marks omitted) (quoting 42 U.S.C. § 2000e–3(a)). In other words, Title VII does not bar retaliation against employees based on their opposition to all unwelcome, hostile, or even illegal employment practices. Rather, Title VII bars retaliation against employees for opposing employment practices made illegal by Title VII itself. *See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) ("An employee's complaint may qualify as protected activity . . . so long as the employee has . . . a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII." (citations, alteration, and quotation marks omitted)).

As discussed above, the Court has determined that Plaintiff has not, in fact, been subject to an employment practice made unlawful by Title VII. Moreover, insofar as Plaintiff believed that he was subjected to such practices, such a belief was not reasonable. For example, when Plaintiff filed the first of his several NYSDHR complaints, he alleged "retaliation for trying to cover up the incident that happen[ed] on the site dealing with OSHA," *not* retaliation for objecting to racial discrimination. (Aug. 2017 Compl. I at 40.) Indeed, Plaintiff made no mention of, and failed to check any boxes related to, his race or other protected characteristics. (*Id.*) While Plaintiff may have genuinely misunderstood the scope of Title VII's protections,

courts have consistently held that it is "objectively unreasonable to believe that complaining about poor treatment in the workplace entirely unrelated to any trait, protected or otherwise, is a 'protected activity' under Title VII." *Johnson v. City Univ. of N. Y.*, 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014), *appeal dismissed*, No. 14-3749 (2d Cir. Feb. 4, 2015); *see also Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999) (requiring that a plaintiff advancing a Title VII retaliation claim allege that she had a "good faith, reasonable belief that the underlying challenged actions of the employer [for which she was punished] violated the law." (citation and quotation marks omitted)). "Accordingly, Plaintiff cannot establish that []he engaged in protected conduct and [his] retaliation claim cannot survive." *Brauer v. MXD Grp., Inc.*, No. 17-CV-2131, 2019 WL 4192181, at *6 (D. Conn. Sept. 4, 2019). Plaintiff's Title VII claims are therefore dismissed.

### d. Due Process

The Railway Labor Act, 45 U.S.C. §§ 151–65, 181–88 (the "RLA"), was enacted to promote "the prompt and orderly settlement of labor disputes between railway carriers and their employees." *United Transp. Union v. Nat'l R.R. Passenger Corp.*, 588 F.3d 805, 809 (2d Cir. 2009) (citation omitted). The RLA provides that disputes over employee discipline "will be resolved internally at the carrier and, if those efforts prove unsuccessful, through binding arbitration before a Special Board of Adjustment, which is created by agreement between the carrier and the union." *Clemmons v. Hodes*, No. 15-CV-8975, 2017 WL 4326111, at *6 (S.D.N.Y. Sept. 26, 2017) (citation omitted), *appeal dismissed*, No. 17-3408, 2018 WL 1907494 (2d Cir. Feb. 14, 2018). Moreover, the RLA strictly limits judicial review of arbitral awards, establishing that "a court may set aside an award only if it finds the Board did not comply with the RLA, considered matters beyond its jurisdiction, or committed fraud or corruption." *Id.*

(citation omitted).  While the Second Circuit has held that the RLA does not totally preclude courts from exercising jurisdiction over an employee's claim of denial of due process by a RLA arbitration board, *see Shafii v. PLC British Airways*, 22 F.3d 59, 64 (2d Cir. 1994) (explaining that an order of an RLA arbitration board "is reviewable upon a claim that a participant was denied due process by the Board"), several courts in the Second Circuit have held that constitutional challenges to the *pre*-arbitration, internal procedures of carrier are not subject to due process challenges, *see, e.g.*, *Dominguez v. Miller*, No. 12-CV-231, 2013 WL 703193, at *8 (E.D.N.Y. Jan. 18, 2013) (declining to exercise jurisdiction over due process claims regarding pre-arbitration proceedings), *report and recommendation adopted*, 2013 WL 703176 (E.D.N.Y. Feb. 26, 2013); *Christiani v. Metro-North Commuter R.R. Co.*, No. 92-CV-4494, 1994 WL 74881, at *5–6 (S.D.N.Y. Mar. 7, 1994) (same); *see also D'Elia v. N.Y., New Haven & Hartford R.R.*, 338 F.2d 701, 702 (2d Cir. 1964) (explaining, arguably in dicta, that the plaintiff was "entitled to a completely impartial hearing only when the case reached the referee designated to sit with the Board").

However, even if the Court were to exercise jurisdiction over Plaintiff's challenge to a pre-arbitration decision here, Plaintiff's due process claims fail on the merits.  Precedent "is clear that the pre- and post-deprivation procedures set forth in a collective bargaining agreement are, typically, sufficient to provide due process."  *See Clemmons*, 2017 WL 4326111, at *12 (citations omitted); *see also Adams v. Suozzi*, 517 F.3d 124, 128 (2d Cir. 2008) ("We have held on several occasions that there is no due process violation where, as here, pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." (collecting cases)); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) (explaining that a collective bargaining

agreement's post-deprivation procedures, providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process); *Verdon v. Consol. Rail Corp.*, 828 F. Supp. 1129, 1138 (S.D.N.Y. 1993) (finding that Metro-North's dispute-resolution mechanisms "properly satisfy due process of law"). Here, Plaintiff acknowledges that he received benefit of such procedures, even if he ultimately disagreed with many of the Hearing Officer's rulings. (*See* Aug. 2017 Compl. I at 13–16.) Moreover, on August 25, 2017, Plaintiff communicated to Metro-North his decision not to appeal the Hearing Officer's decision and Plaintiff's related suspension. (Nov. 2017 Compl. II at 18.) The existence of such an appeal procedure, and Plaintiff's decision not to pursue it, forecloses Plaintiff's claim that he was denied due process. *See Rivera-Powell v. N. Y. C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (explaining that where state procedures provide adequate procedural protection, there is no due process violation); *McGann v. City of N. Y.*, No. 12-CV-5746, 2013 WL 1234928, at *8 (S.D.N.Y. Mar. 27, 2013) (explaining that a plaintiff's "fail[ure] to avail himself of" state procedural protections precluded his due process claims). Accordingly, because Plaintiff fails to allege that he was deprived of the appropriate procedural protections afforded to him under the collective bargaining agreement, his due process claims are dismissed.[8]

---

[8] To the extent that Plaintiff challenges the constitutionality of his disciplinary hearings based on his concerns regarding "double jeopardy," (*see* Oct. 2017 Compl. 11–13), such complaints are without merit. The Double Jeopardy Clause "protects only against the imposition of multiple *criminal* punishments for the same offense, and it thus does not extend to civil penalties." *Dubin v. County of Nassau*, 277 F. Supp. 3d 366, 398 (E.D.N.Y. 2017) (emphasis in original) (quotation marks omitted) (citing *Hudson v. United States*, 522 U.S. 93, 99 (1997)); *see also Porter v. Coughlin*, 421 F.3d 141, 144, 148–49 (2d Cir. 2005) (finding the Double Jeopardy Clause inapplicable to prison discipline because such discipline "was civil in nature").

e.  FRSA Retaliation

Plaintiff also appears to allege a violation of the whistleblower provision of the FRSA, 49 U.S.C. § 20109.  In 1980 Congress added a retaliation provision to FRSA to protect employees who "reported violations of federal railroad safety laws or refused to work under hazardous conditions."  *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 37 (D.D.C. 2013) (citing Federal Railroad Safety Authorization Act of 1980, Pub. L. No. 96–423, § 10, 94 Stat. 1811, 1815 (1980)).

To plead a prima facie case of retaliation under the FRSA, an employee must allege sufficient facts suggesting that: "(i) the employee engaged in protected activity as defined in the FRSA; (ii) the employer knew that the employee had engaged in protected activity; (iii) the employee suffered an unfavorable personnel action; and (iv) the protected activity was a contributing factor in the unfavorable action."  *Lockhart v. MTA Long Island R.R.*, 949 F.3d 75, 79 (2d Cir. 2020) ("*Lockhart II*") (collecting cases).  As relevant here, FLSA protected activities include "reporting, in good faith, a hazardous safety or security condition."  *Id.* at 78 n.4 (quoting 49 U.S.C. § 20109(b)(1)(A)).

Here, Plaintiff has not plausibly alleged at least two elements of a prima facie case.  First, Plaintiff has not alleged facts suggesting that "a hazardous safety or security condition" existed, let alone that he "report[ed]" such a condition.  *Id.* (citation omitted).  On the contrary, Plaintiff claims only that he admonished Nesbeth for improperly cleaning a bloody tampon.  (Aug. 2017 Compl. II at 1.)  While an improperly cleaned tampon may be unsanitary, Plaintiff does not explain why it would be reasonable for him to believe that Nesbeth's conduct amounted to "a hazardous safety or security condition" within the meaning of the FRSA.  *See Ziparo v. CSX Transp., Inc.*, No. 17-CV-708, 2020 WL 1140663, at *17–18 (N.D.N.Y. Mar. 9, 2020) (requiring

that a plaintiff's good faith belief in the existence of a safety hazard be "objectively reasonable"); *March v. Metro-North R.R. Co.*, 369 F. Supp. 3d 525, 533 (S.D.N.Y. 2019) (same). On the contrary, cleaning such materials appears to be precisely within the purview of Plaintiff's role as a car cleaner.

Second, even if Nesbeth's conduct did amount to "a hazardous safety or security condition" under FLRA, Plaintiff still has not alleged circumstances suggesting that his reporting of Nesbeth's conduct was "a contributing factor" to disciplinary proceedings. *See Lockhart II*, 949 F.3d at 79 (requiring that "the protected activity was a contributing factor in the unfavorable action"). By Plaintiff's own account, he was initially removed from service by Rogers on December 2, 2016—immediately following an unrelated altercation with Nesbeth—and was subsequently suspended following a disciplinary proceeding held on July 20, 2017. (Aug. 2017 Compl. I at 13–14.) Plaintiff does not, however, provide any indication that Rogers was even aware of the cleaning incident at the time of the December 2, 2016 suspension decision. Moreover, insofar as Plaintiff alleges that Keitt eventually informed Rogers about the cleaning incident, (*Id.* at 15), Plaintiff does not allege when this occurred. Nor does Plaintiff allege that he himself reported the incident to Keitt or anyone else, that he did so because he believed the incident reflected a "hazardous safety or security condition," that he made such a report with temporal proximity to when he was disciplined, or that Keitt, Rogers, or any other supervisor expressed resentment or disapproval of such a report. In the absence of such allegations, or any other factual context surrounding any "reporting" by Plaintiff of the cleaning incident, the Court cannot plausibly infer retaliatory intent. *See Niedziejko v. Del. & Hudson Ry. Co.*, No. 18-CV-675, 2019 WL 1386047, at *44 (N.D.N.Y. Mar. 27, 2019) (collecting cases and explaining that gaps in more than two months between a report and an adverse action are too attenuated to raise

an inference of discriminatory animus or retaliatory intent); *Lockhart v. Long Island R.R. Co.*, 266 F. Supp. 3d 659, 664 (S.D.N.Y. 2017) ("*Lockhart I*") (requiring some indication of "intentional retaliatory animus" to support a FLSA retaliation claim), *aff'd sub nom. Lockhart II*; *cf. Nichik v. N. Y. C. Transit Auth.*, No. 10-CV-5260, 2013 WL 142372, at *5 (E.D.N.Y. Jan. 11, 2013) (denying defendant's motion for summary judgment because there was "direct and circumstantial evidence" that retaliatory animus was a contributing factor in the unfavorable personnel action). Accordingly, Plaintiff's FLSA retaliation claim is dismissed.

### 2. Union Claims

While Plaintiff does not delineate precisely the nature of his claims against Union Defendants, the Court interprets Plaintiff's pleadings liberally and construes them as raising claims under Title VII, a union's duty of fair representation, and the NYSHRL.

### a. Individual Defendants

As a threshold matter, Plaintiff cannot sustain any of these claims against the individual Union Defendants. First, as discussed above, it is well-settled that individuals cannot be held liable under Title VII. *See Reynolds*, 685 F.3d at 202 ("Employers, not individuals, are liable under Title VII." (citation omitted)); *Johnson*, 2019 WL 569106, at *4 (noting that "individuals are not subject to liability under Title VII" (collecting cases)). Second, precedent makes clear that individual union officers and members are not personally liable for an alleged breach of the duty of fair representation. *See Morris v. Local 819, Int'l Bhd. of Teamsters*, 169 F.3d 782, 784 (2d Cir. 1999) ("[T]he caselaw provide[s] a shield of immunity for individual union members in suits for breach of the duty of fair representation." (collecting cases)); *Clemmons*, 2017 WL 4326111, at *14 (dismissing claims against TWUA officer because "there is no liability for individual union members for breach of the duty of fair representation" (citation omitted)).

Indeed, in issuing an Order of Service in one of these cases prior to consolidation, the Court already dismissed claims against Patrick Howard on precisely these grounds. (*See* Case No. 18-CV-8350, Dkt. No. 6.) Accordingly, the Court dismisses all claims against Howard and Feltz.[9]

### b. Duty of Fair Representation

Under the National Labor Relations Act ("NLRA") and federal common law, "unions owe their members a duty of fair representation . . ., which derives from the union's statutory role as exclusive bargaining agent." *McLeod v. 1199 SEIU United Healthcare*, No. 17-CV-7500, 2019 WL 1428433, at *5 (S.D.N.Y. Mar. 29, 2019) (citation and quotation marks omitted). This duty obligates unions "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76 (1991) (citation omitted); *see also Agosto v. Corr. Officers Benevolent Ass'n*, 107 F. Supp. 2d 294, 303 (S.D.N.Y. 2000) (same). To successfully plead a breach of this duty, union member plaintiffs must plausibly allege two elements: (1) "that the union's actions or inactions are either arbitrary, discriminatory, or in bad faith" and (2) "a causal connection between the union's wrongful conduct and their injuries." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (citations and quotation marks omitted). Both the Supreme Court and the Second Circuit have emphasized that a court's review of such allegations is "highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *Id.* (alteration in original) (quoting *O'Neill*, 499 U.S. at 78). Thus, a union's actions will only be actionable if they are "so far outside a wide range of reasonableness as to be

---

[9] Insofar as Plaintiff also advances NYSHRL claims against these individual Defendants, the Court declines to exercise supplementary jurisdiction over those claims for the reasons stated below.

irrational"; "tactical errors[,] . . . even negligence" are insufficient to establish such a breach.  *Id.*
(citations, alteration, and quotation marks omitted).  Similarly, a union's conduct is only
actionably discriminatory when "substantial evidence indicates that it engaged in discrimination
that was intentional, severe, and unrelated to legitimate union objectives." *Id.* (citation and
quotation marks omitted).  Likewise, actionable "[b]ad faith" requires that a union engaged in
"intentionally misleading conduct . . . with an improper intent, purpose, or motive." *Id.* at 709–
10 (citation and quotation marks omitted).

Plaintiff's allegations do not come close to meeting these standards.  First, Plaintiff's
allegations concerning the Union are almost entirely conclusory.  For example, Plaintiff alleges
that Feltz "drop[ped] the ball by allowing Metro-North Railroad to bully the Union and
[Plaintiff]"; that Union Defendants failed to "protect" Plaintiff; and that the Union "play[ed[
along with the kangaroo court process to deceive [Plaintiff]" and was "in collusion with Metro-
North."  (Oct. 2017 Compl. 5–6; Sept. 2018 Compl. 5 (Case. No. 18-CV-8350, Dkt. No. 2).)
Because such allegations lack factual content, they are insufficient to survive a motion to
dismiss.  *See Forkin v. Local 804 Union (IBT)*, 394 F. Supp. 3d 287, 301–02 (E.D.N.Y. 2019)
(rejecting a plaintiff's conclusory allegation that his union processed his grievance in bad faith);
*Napoleoni v. N. Y. C. Dep't of Parks & Recreation*, No. 18-CV-2578, 2018 WL 3038502, at *4–
5 (E.D.N.Y. June 18, 2018) (explaining that allegations regarding a union's failure to achieve a
"positive resolution" of plaintiff's complaints were conclusory and insufficient).  Second, insofar
as Plaintiff's pleadings contain factual content, these allegations do not suggest irrational or
discriminatory conduct.  For example, Plaintiff alleges that Feltz was "also present" during his
July 20, 2017 Metro-North trial.  (Oct. 2017 Compl. 11).  Far from suggesting a breach of the
fair duty of representation, Feltz's presence at Plaintiff's disciplinary hearing—and the multiple

letters Feltz submitted to Metro-North on Plaintiff's behalf, (*see id.* at 30–33, 34, 49)—suggest energetic representation by Feltz and the Union. Indeed, such allegations confirm Plaintiff's own evaluation of Feltz as "a [g]ood []man." (*Id.* at 12, 14.) While Plaintiff may well be disappointed by the outcome of his various disciplinary proceedings, this disappointment does not provide a basis for the claimed breach of the duty of fair representation. *See Nikci v. Quality Bldg. Servs.*, 995 F. Supp. 2d 240, 249–50 (S.D.N.Y. 2014) (rejecting duty of fair representation claims based on mere disagreement or dissatisfaction). Accordingly, because Plaintiff has failed to plausibly allege that the Union's conduct was "arbitrary, discriminatory, or in bad faith," his duty of fair representation claim is dismissed. *Braxton v. TWU Local 100*, No. 16-CV-9425, 2017 WL 6542500, at *3 (S.D.N.Y. Dec. 21, 2017) (citation and quotation marks omitted).

### c. Title VII

Title VII proscribes certain discriminatory practices not only by employers, but also by labor organizations, prohibiting unions from "exclud[ing] or . . . expel[ling] from its membership, or otherwise to discriminat[ing] against, any individual because of his race, color, religion, sex, or national origin" and from " caus[ing] or attempt[ing] to cause an employer to discriminate against an individual" for the same. 42 U.S.C.S §§ 2000e-2(c)(1), (3). Although Title VII claims against a labor organization resemble claims against employers in some respects, "where a plaintiff claims that a union violated Title VII based on its failure to represent a member, courts in [the Second] Circuit generally incorporate the duty of fair representation as one of the elements of the alleged Title VII violation." *Agosto*, 107 F. Supp. 2d at 304 (collecting cases); *see also McIntyre v. Longwood Cent. Sch. Dist.*, 380 F. App'x 44, 49 (2d Cir. 2010) (explaining that plaintiff seeking "to establish a violation of Title VII . . . would have to show, at a minimum, that the union breached its duty of fair representation and that its actions

were motivated by discriminatory animus" (citation omitted)); *McLeod v. 1199 SEIU United Healthcare*, No. 17-CV-7500, 2019 WL 1428433, at *8 (S.D.N.Y. Mar. 29, 2019) (incorporating the duty of fair representation as one of the elements of the alleged Title VII violation); *Beachum v. AWISCO N. Y.*, 785 F. Supp. 2d 84, 103 (S.D.N.Y. 2011) (same). Here, as discussed above, the Court has already determined that Plaintiff has failed to plausibly allege a breach of its duty of fair representation. Accordingly, Plaintiff's Title VII claims against the Union are dismissed. *See McLeod*, 2019 WL 1428433, at *9 (explaining that a failure to adequately plead a breach of the duty of fair representation was a "fatal flaw" for Title VII claims as well).

### d. NYSHRL Claims

Finally, to the extent Plaintiff pursues NYSHRL or other state-law claims against the Union Defendants, the Court declines to exercise jurisdiction over such claims in light of the dismissal of all federal claims. *See Matican v. City of New York*, 524 F.3d 151, 154–55 (2d Cir. 2008) (noting that, where a court has dismissed all claims over which it has original jurisdiction, "it is within the district court's discretion to decline to exercise supplemental jurisdiction over the pendent state-law claims" (citation and footnote omitted)); *Ward v. Coley*, No. 18-CV-2382, 2019 WL 977887, at *8 (S.D.N.Y. Feb. 28, 2019) (same).

### III. Conclusion

For the reasons stated above, both the Metro-North Motion To Dismiss and the Union Motion To Dismiss are granted. Because this is the first adjudication on the merits of the Plaintiff's claims, dismissal is without prejudice.

If Plaintiff wishes to file an amended complaint in either of these two Actions, he must do so within 30 days of the date of this Opinion. Plaintiff should include within that amended complaint changes to correct all deficiencies identified in this Opinion that Plaintiff wishes the

Court to consider.  Plaintiff is advised that the amended complaint will replace, not supplement, prior pleadings.  The amended complaint must contain all of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider.  Failure to file an amended complaint may result in dismissal of all claims with prejudice.

Plaintiff is also warned that the Court will strictly enforce the requirement that a complaint contain "a short and plain statement of the claim."  Fed. R. Civ. P. 8(a).  Neither Defendants nor the Court should have to sift through hundreds of pages of pleadings and attachments to discern Plaintiff's allegations.  Accordingly, failure to comply with Rule 8 will result in dismissal, possibly with prejudice.

Relatedly, Plaintiff is reminded that any future submissions must be filed in the docket corresponding to the lead case in that Action.  Accordingly, submissions in the Metro-North Action must be filed under Case No. 17-CV-3092, and submissions in the Union action must be filed under Case No. 17-CV-7758.

The Clerk of the Court is respectfully directed to terminate the pending Motions, (Case No. 17-CV-3092, Dkt. No. 82; and Case No. 18-CV-8350, Dkt. No. 18), and mail a copy of this Opinion to Plaintiff.

The Clerk of Court is also respectfully directed to terminate submissions styled as motions by Plaintiff: Case No. 17-CV-3092, Dkt. No. 86; Case No. 17-CV-9167, Dkt. No. 54; Case No. 17-CV-7758, Dkt. No. 36; and Case No. 18-CV-8350, Dkt. No. 23.

SO ORDERED.

DATED:  March 27, 2020 White
        Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE